## A. D. Guyer v. The State.

*No. 1075.    Decided June 17th, 1896.*

#### 1. Theft—Detectives as Accomplices—Charge—Accomplice Testimony.

On a trial for theft of one head of cattle, where it appeared that one L. was employed by the sheriff as a detective to ferret out and assist in the arrest of parties suspected of cattle stealing, and said sheriff also made arrangements with one P. to aid the parties in getting the slaughtered meat across the river, and with one G.

that, when the meat was brought over the river, he should buy the same from the parties. And, in pursuance of arrangements, L. went with defendant and his confederate and aided and assisted them in slaughtering the animal, and in conjunction with the other parties named carried out the plans as previously arranged by the sheriff. Held: That the court erred in failing, in the charge to the jury, to submit to them for their determination, whether or not all the parties, L., P. and G., were accomplices participating in the crime, or were simply acting as detectives in ferreting out crime. And it was error for the court, as was done, to limit and single out L., alone in applying the law of accomplice testimony to the facts in the case; such a charge being tantamount to an instruction that P. and G. were not accomplices.

2. **Sheriffs—Employment of Detectives to Aid in Carrying Out Contemplated Crime.**

Sheriffs should never encourage and assist parties to commit crime, in order that they may arrest and have them punished for so doing; it is their duty to prevent crime, and "nip it in the bud," instead of lending aid and encouragement in carrying it out.

APPEAL from the District Court of Wharton. Tried below before Hon. T. S. REESE.

Appeal from a conviction for theft of one head of cattle; penalty, two years' imprisonment in the penitentiary.

The opinion states the case.

[No briefs for either party have come to the hands of the Reporter.]

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of the theft of cattle, and given two years in the penitentiary, and prosecutes this appeal. There is but one bill of exceptions in the record in this case, and it raises the question as to the sufficiency of the court's charge on accomplice testimony. The court charged the jury on the subject of accomplice's testimony, but confined the charge to one witness by name —D. O. Love. Appellant contends that the evidence in the case equally showed that John Pace and Billie Glass were accomplices, and that the court's charge should not have been restricted to Love, but should have embraced said two witnesses, or have been a general charge on the subject of accomplices, without naming any one, and left the question as to who were accomplices to be determined by the jury. The record in this case shows substantially, as follows: The head of cattle alleged to have been stolen was the property of one A. H. Pearce. The sheriff suspected that some persons were engaged in cattle stealing "over on the Sandy and Golden Rod," in Wharton County, and commissioned one D. O. Love to detect such parties. Love went over in that county, and stopped at one W. B. Collingsworth's, and stayed all night there. At the same time the defendant (A. D. Guyer) and A. O'Brien came to said house, and stayed all night. The defendant and O'Brien were ostensibly going down the river to get some corn, and Love informed Collingsworth that he was expecting defendant and O'Brien to come over and get corn on the river. The witness, Love, states that they left Collingsworth on the morning of the 4th of

March—Guyer, O'Brien, and himself—all three on horseback. Defendant and witness had guns, but O'Brien had none, but had some sacks tied behind his saddle, and a hatchet in one of the sacks. Defendant told him he wanted him to help him kill a beef. After they left the house the parties separated, Guyer going out into the prairie to run the beef into the woods, and O'Brien and witness went into the bottom, and in a short time witness heard a gun fired, and went there and found a cow dead. That he did not know who fired the shot. The cow belonged to A. H. Pearce. O'Brien, Guyer, and witness skinned the cow, and quartered it up, and put the meat in the sacks O'Brien had on his saddle. The defendant put the hide, heart and a piece of the fat in one sack, and hid it near the road. The parties then took the meat to the river, and the witness "went up the river a little way, and called John Pace, and had him bring his boat over, and cross the meat for us. O'Brien left Guyer and myself at the river, and went away, saying he was going to Wharton," and Guyer and witness went over with the beef in the boat. Witness hired a wagon and team from John Pace, and defendant and witness took the beef in the wagon to Billie Glass' house, and defendant sold the beef to Glass for $12.50, and Glass gave him an order on Payne, at Wharton, for the money. "I wrote the order, and Glass signed it." They then took the wagon and team to Pace, and got their horses, and came to town. Witness shows that he got $9 in money from the sheriff to aid in ferreting out that particular transaction. The sheriff, Rich, shows that he had paid the witness, D. O. Love, for ferreting out cattle stealing in that county, $140. Sheriff Rich also says that he instructed him (Love) not to lead any one into trouble, but to get in with them, if he could, and not to contrary them, but do as they wished him to do. The witness, John Pace, testified that, on the Sunday before the 4th of March, Sheriff Rich came to him, and told him, if anybody came and wanted him to put any beef across the river, "to do it and keep my mouth shut, and I told him I would"; that when D. O. Love came to the river, and called him to bring his boat over and cross some meat for him, he took the boat over, and Mr. Love, defendant, and witness put the beef in the boat, and put it across the river; that he then hitched up his team to his wagon, and Love and the defendant drove off with the beef in it. Love paid him $2 when he came back that evening, in the wagon, with the team. The witness, Billie Glass, testified that Sheriff Rich came to his house a few days before the beef was brought there by Love and the defendant, and told him there would be a young man there to sell him some beef, and that Love would come with him, and for him to buy the beef; that in a day or so after this witness got uneasy, and went to Wharton to see Rich about it, and told him that he would rather not have anything to do with it, as they were all white men, and he wanted to get out of it, and Rich told him to go ahead and buy the beef, and he would stand between him and trouble. He testified that when the parties brought the beef to him he bought it for

$12.50, and gave defendant an order to Mr. Payne, in Wharton, for the amount. A. O'Brien testified, for the defendant: That Love came to his house about a week before the alleged theft, and remained there several days. While there he told defendant and witness, in the presence of his wife, daughter, and son Fred, that he (Love) had about $180 in the bank, and that he intended to go into the butcher business. He also said that he had three or four fat cows down there, "and when we went over after corn, if we would help him to kill one of the cows, he would help" defendant and witness "get our corn across the river." That they started on the morning of the 28th of February down on the river, but found the creek up and abandoned the trip. On the 3rd of March, defendant and witness started again to the river for the corn. They went as far as W. B. Collingsworth's, and stayed all night. D. O. Love was there. On the next morning defendant and witness were at the lot, and Love came out and said: "I want you fellows to help me kill that beef today." Witness told him defendant might go, but that he had to go to Wharton on business. Love insisted that both should go and help him, and that he would help them to get the corn over the river. That they all got ready, and left the house together, but before leaving the house Love picked up a hatchet, and stuck it down, handle first, in his pants. "I tied the sacks I brought to get the corn in behind my saddle." Guyer and Love both had guns. Witness had none. When they got to the edge of the bottom, Love sent the defendant out on the prairie to hunt for the cow. Love and witness went in the bottom, and struck a bunch of cattle, and Love ran a cow down the bank of the river, and into a gully that ran into the river, and shot the cow down. That Love and witness commenced skinning the cow, and, when they had nearly finished skinning it, defendant rode up, and helped to finish skinning the cow. That they then cut it up, and put it in the sacks, and Love put the hide, heart, and a piece of the fat, and the hatchet in one sack, and hid it near the road, and left it there, where it was subsequently found. That they took the balance of the meat to the river. Love went up the river, and called a man, and asked him to bring his boat over and cross the meat. Love and defendant went over with the meat in the boat, and witness went to town. The testimony of Mrs. A. O'Brien and F. A. O'Brien, the wife and son of the former witness, corresponds with the testimony of the witness, A. O'Brien, as to what transpired at the house of said A. O'Brien on the 28th of February. The defendant, Guyer, testified in his own behalf, and his evidence corresponded with that of A. O'Brien, as to all of the facts testified to by him; and, further: That he and Love took the beef across the river, and hired a team from the man (Pace) who carried them across, and took the beef up to the house of Bill Glass. On the way there, Love asked him to sell the beef for him, and said that he owed some parties up there, and did not want to pay them. That he sold the beef, as requested, for $12.50. That Glass gave him an order on Payne, at Whar-

ton, "and Love told me, as the order was in my name, I would have to go to Wharton and collect the money." Love wrote the order, and Glass signed it. They went back and crossed the river, and went down to Wharton that evening. "Love left me near the railroad, and said he was going up town on business, and would meet me up there. I went in Payne's store, presented the order, and they gave me a draft for the money. I then went to the bank, and it was closed; then to Roseberry's store, and, while waiting to get the check cashed, Love and Rich walked in. Love introduced Rich to witness. Rich pretended to be surprised, and glad to meet me. He then arrested me (defendant), and handcuffed me." Defendant asked him what he was arrested for. "Rich said he would tell me later. He then took the check and a nickel out of my pockets, and carried me to the court house, and there found and arrested O'Brien." Witness stated that he did not know whose cow it was that O'Brien and Love were skinning, when he found them in the bottom, but supposed it belonged to Love. This, in the main, is the testimony of both the State and the defendant upon all of the salient features of the case. On this testimony it would appear that both Pace and Glass were either particeps criminis with the defendant in the theft of said beef, as they aided him in disposing of the same, or else were detectives engaged in ferreting out crime; and while they did not have as much to do with the transaction as the witness, Love, yet the testimony is ample to place them in the same category with him. And under the circumstances the court should have applied the charge on accomplices' testimony equally to them as to the witness, Love; and it should have been submitted to the jury to determine whether they were accomplices, or not, participating in the crime for the purpose of theft, or simply acting as detectives in ferreting out crime. This the court did not do, but, on the contrary, singled out Love alone in the charge. This was tantamount to instructing the jury that Pace and Glass were not accomplices, and that Love's evidence could be corroborated by others, when the court should have left the question as to whether or not they were accomplices to be decided by the jury. We would furthermore observe, in this connection, that there is enough in this record to at least suggest that this was a trap or scheme set on foot by Love in order to induce the defendant and O'Brien to commit a theft so that he might profit thereby. It further appears that the sheriff of the county was co-operating with Love— whether with a knowledge of Love's purposes or not does not appear, except that he told Love not to lead any one into trouble, but to get in with them, if he could, and not contrary them, but do as they wished to do. We rather infer that Love was bleeding him for his own purposes, but it is rather curious that the sheriff should have foreseen for a week or more that the beef would be carried across the river by defendant, and sold to Glass. The testimony of both Pace and Glass in this regard stands uncontradicted. There is no testimony in the record, of a positive character, indicating that Pearce, the owner of the cow, was a party to

this plan, or that he was consenting or agreeing that the sheriff and Love should take the cow for this purpose. If he was so assenting, then there was no theft in this case. If he was not, then all of the parties who engaged in this scheme are guilty of a criminal offense, and each of them was an accomplice, under this view, whose testimony would have to be corroborated by that of other witnesses. We do not undertake to say that the evidence establishes that there was such a plan on foot, but certainly there are some facts in the record which, standing uncontradicted, tend to indicate this view. We can conceive of no conduct more reprehensible on the part of officers, whose duty it is to prevent crime, and "nip it in the bud," instead of so doing, to lend aid and encouragement in carrying it out. As was said by Marston, judge, in Saunders v. People, 38 Mich., 218: "Where a person contemplating the commission of an offense approaches an officer of the law, and asks his assistance, it would seem to be the duty of the latter, according to the plainest principles of duty and justice, to decline to render such assistance, and to take such steps as would be likely to prevent the commission of the offense, and tend to the elevation and improvement of the would-be criminal, rather than to his further debasement. Some courts have gone a great way in giving encouragement to detectives in some very questionable methods adopted by them to discover the guilt of criminals, but they have not yet gone so far, and I trust never will, as to lend aid or encouragement to officers who may, under a mistaken sense of duty, encourage and assist parties to commit crime in order that they may arrest and have them punished for so doing." In this case the sheriff, instead of laying a plan to have the crime carried out, should have taken steps to prevent it. Instead thereof, it appears, not only from the testimony of the defendant's witnesses, but from the testimony of Love and others, that he was an active participant in the entire transaction, and his own testimony scarcely relieves him from the taint that the crime was suggested by him. For the error of the court in the charge given on accomplice's testimony, the judgment in this case is reversed, and the cause remanded.

*Reversed and Remanded.*

HURT, Presiding Judge, absent.